# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

|  |  |
|---|---|
| In the Matter of the Tracking of<br>*(Identify the person to be tracked or describe*<br>*the object or property to be used for tracking)*<br>IN THE MATTER OF THE USE OF A CELL-SITE<br>SIMULATOR TO LOCATE THE CELLULAR<br>TELEPHONE ASSIGNED CALL NUMBER (520)<br>540-7289 | )<br>)<br>)<br>)<br>)<br>) |

Case No.    1:23MJ **443**

## APPLICATION FOR A TRACKING WARRANT

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of __21__ U.S.C. § __841 and 846__ . Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location.  The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☐ property designed for use, intended for use, or used in committing a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ a person to be arrested or a person who is unlawfully restrained.

☐ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a tracking warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

/s/ Jordan Wicks
_____
*Applicant's signature*

Jordan Wicks, U.S. Postal Inspector
_____
*Applicant's printed name and title*

Date: __10/19/2023__

_____
*Judge's signature*

City and state:   __Winston-Salem, North Carolina__

The Hon. Joi Elizabeth Peake, U.S. Magistrate Judge
_____
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (520) 540-7289 | Case No. 1:23MJ _443_ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Inspector Jordan Wicks, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular device assigned call number (520) 540-7289, (the "Target Cellular Device"), which is described in Attachment A.

2. I am a U.S. Postal Inspector and have been so employed since 2018. I am currently assigned to Raleigh, North Carolina and am responsible for the investigation of narcotics, drug trafficking organizations, and money laundering. I have received training by the United States Postal Inspection

Service ("USPIS"), and members of the USPIS, in the investigation of controlled substances or proceeds/payments being transported through the United States. From 2014 to 2018, I was employed as a Special Agent with the United States Army Criminal Investigation Division (CID) as a supervisor in the Special Victims Unit. From 2008 to 2014, I was employed as a Detective with the Maplewood Police Department, St. Louis County, Missouri. From 2006 to 2008, I was employed as a Narcotics Detective with the Lincoln County Sheriff's Office, Missouri. From 2001 to 2005, I was a member of Security Forces in the United States Air Force. I have experience and advanced training pertaining to drug related investigations from the USPIS, Drug Enforcement Administration ("DEA"), U.S. Army, International Narcotics Interdiction Association, Midwest Counterdrug Training Academy, Missouri Narcotic Officers Association, the Multijurisdictional Counterdrug Task Force, as well as various other federal agencies and organizations.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

4.     One purpose of applying for this warrant is to determine with precision the Target Cellular Device's location.  However, there is reason to believe the Target Cellular Device is currently located somewhere within this district.  On August 15, 2023, the Honorable United States Magistrate Judge L. Patrick Auld issued a search warrant (1:23 MJ 354) authorizing the geo-location of the Target Cellular Device to be monitored.   I have monitored the location data obtained for the Target Cellular Device from the service provider pursuant to the above listed warrant and it regularly shows to be within the Middle District of North Carolina.  Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code §§ 841(a) and 846 (distribution and conspiracy to distribute narcotics) have been committed, are being committed, and will be committed by Nicholas Curry, the identified holder of the Target Cellular Device. There is also probable cause to believe that the location of the Target Cellular Device will constitute evidence of these criminal violations, including leading to the identification of individuals who are engaged in the commission of these offenses and identifying locations where the target engages in criminal activity.

3

6.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

7.     The United States, including the USPIS, Homeland Security Investigations ("HIS"), and DEA, are investigating a Mexico-based money laundering and drug-trafficking organization ("MLDTO") responsible for smuggling bulk quantities of methamphetamine and fentanyl through the Ports of Entry in Arizona, staging the illicit narcotics in the Phoenix, Arizona, area, and distributing the narcotics throughout the United States to include the Middle District of North Carolina. This investigation has established evidence that Nicholas CURRY and Carmen VALENZUELA are engaged in a conspiracy to distribute methamphetamine and fentanyl in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957.

4

8. In January of 2023, the USPIS began reviewing United States Postal Service ("USPS") business records and identified suspected drug-laden parcels mailed to the Middle District of North Carolina. While reviewing records regarding potential residents associated with the addresses of the suspected drug-laden parcels, USPIS learned one of the addresses involved in the investigation was associated with a DEA investigation.

9. In February of 2023, the USPIS reviewed USPS business records associated with the suspected drug-laden parcels mailed to the Middle District of North Carolina. These records led to the identification of suspected money packages being mailed from the Middle District of North Carolina to Carmen VALENZUELA in Glendale, Arizona. I know through my training and experience, as well as from consulting with members of the USPIS, that individuals who receive drugs from source locations will often mail the drug proceeds from the non-source state back to the origin of the drug packages. In this instance, the suspected and confirmed drug packages are being mailed from Phoenix to the Middle District of North Carolina. The suspected and confirmed money packages are then mailed from the Middle District of North Carolina back to Carmen VALENZUELA.

10. Since February of 2023, the investigative team has conducted numerous surveillance operations on the delivery of USPS packages mailed from Phoenix

5

and delivered to the Middle District of North Carolina. Investigators have observed Nicholas CURRY on numerous occasions either retrieving packages or being present during the delivery of suspected narcotics packages with other co-conspirators in North Carolina. CURRY appears to oversee the operation in North Carolina, while conspiring with other MLDTO members in Arizona to order and ship the packages.

## MAY 2023 SEIZURE OF METHAMPHETAMINE

11. Throughout the course of the investigation, the investigative team cultivated a confidential source ("CS")[1] who provided information regarding CURRY's involvement in the importation of narcotics into North Carolina and also confirmed he/she purchased multi-pound quantities of methamphetamine from CURRY. The CS confirmed CURRY had temporarily re-located to North Carolina from Tucson, Arizona, and was responsible for shipments of narcotics via the USPS into North Carolina. These shipments were ordered and fulfilled

---

[1] CS SA-033-WS is a convicted felon. The CS has provided information that has been independently verified by the USPIS, HSI, and DEA, through physical surveillance, electronic surveillance, pen registers and trap and trace, USPS business records, and multiple law enforcement databases. Information provided by the CS was known to the USPIS, HSI, and DEA, prior to the CS agreeing to cooperate with law enforcement. The CS has provided substantial information against self-interest in hopes of receiving leniency if he/she is criminally charged as part of this investigation.

6

from the Phoenix, Arizona, area, and upon their arrival to North Carolina, CURRY was responsible for the distribution network of those narcotics.

12. On May 26, 2023, the investigative team coordinated with the CS, who stated CURRY previously asked the CS to provide addresses at which drug shipments could be received. The CS provided information that two USPS packages were currently in transit to 925 Gillette Street, Winston-Salem, North Carolina; this address was previously known to the investigative team and identified as part of this ongoing investigation. USPIS conducted a review of USPS business records and did not locate any packages actively in transit to this address.

13. On May 27, 2023, the investigative team met the CS to attempt to identify recover the inbound drug-laden parcel. Investigators attempted to obtain tracking information from the CS; however, the CS relayed that CURRY would not provide tracking information for the package and would only inform the CS when the package arrived at the intended destination. Prior to meeting investigators, CURRY contacted the CS and informed him/her that the drug-laden parcel had arrived. USPIS reviewed business records and found there had not been a package delivered to 925 Gillette Street. The investigative team travelled to 925 Gillette Street and confirmed a package had not been delivered.

14.    After discovering there had not been a package delivered to 925 Gillette Street, investigators directed the CS to place a consensually monitored and recorded telephone call to CURRY at 520-540-7289[2] (**Target Cell Phone**) (which the CS provided to law enforcement as CURRY's telephone number) to inquire about the whereabouts of the parcel.  During the ensuing conversation, CURRY was informed the package did not arrive to the intended destination, to which CURRY expressed his discontent because he would be financially responsible for the contents of the parcel (20 pounds of methamphetamine). CURRY informed the CS he had spoken to "his people" in Arizona, who confirmed they sent the parcel to 925 Gillette Street, which CURRY provided as an address to use after receiving it from the CS.  Furthermore, during the conversation, CURRY confirmed the contents of the parcel was 20 pounds [of methamphetamine] and he claimed it should not have been a problem because they had sent the same amount on numerous occasions.

15.    Approximately ten minutes after the initial call, CURRY contacted the CS again from the **Target Cell Phone**.  During the second call, CURRY stated

_____

[2] On June 2, 2023, the Honorable United States Magistrate Judge Joe L. Webster issued a Court Order (1:23 MJ 229-1) authorizing a pen register and trap and trace on this Verizon Wireless number used by Nicholas Curry.  On July 27, 2023, the Honorable United States Magistrate Judge Joi E. Peake issued a Court Order (1:23 MJ 324) authorizing a pen register and trap and trace on this Verizon Wireless number used by Nicholas Curry.

8

he believed someone from the USPS stole the parcel because the package was from Arizona, which was a "huge red flag" in this game, indicating USPS employees know that packages from Arizona, as a narcotics source state, can contain narcotics, and the USPS employees will steal the packages and the narcotics within them. CURRY provided the CS instructions on how to ensure the CS always arrived at the destination address prior to the package's arrival and provided instructions on how to avoid detection by law enforcement, while being present when the package arrives to ensure no other packages were lost in the future. Furthermore, CURRY confirmed the package destined for 925 Gillette Street was delivered on May 27, 2023, at 1:20 p.m.

16. Based on CURRY stating the package had been delivered at 1:20 p.m., the USPIS conducted a review of USPS business records regarding packages mailed from Phoenix to the immediate area and found two packages were delivered to 425 Gossett Street, Winston-Salem, North Carolina, on May 27, 2023, at 1:19 p.m. and 1:20 p.m. USPIS also confirmed that another one of CURRY's cellular numbers, (623) 258-3180, was receiving text message ("SMS") notifications on the delivery status of the packages. Therefore, Curry would have been notified the package was delivered at 1:20 p.m. Based on the delivery times, the proximity of the delivery locations, the similarities of both

addresses, and that CURRY was tracking the packages, it was the belief of the investigative team that both packages were delivered to the wrong address.

17.    On May 27, 2023, USPIS contacted the residents at 425 Gossett Street. The residents confirmed that earlier in the day two packages were delivered to their house that were not intended for them. The homeowners stated they noticed both packages were addressed to a different residence (925 Gillette Street) and not 425 Gossett Street. The homeowners called the U.S. Post Office; however, the facility was closed at the time. The homeowners voluntarily turned over both packages, which were sealed, unopened, and stacked next to the interior door. Inspector Wicks immediately detected the strong odor of methamphetamine emanating from both packages.

18.    When a person mails a package person to person through the USPS, they frequently handwrite the sender and receiver address on the package. They then turn the package over to the custody of the USPS at a retail counter. The USPS employee manually enters the recipient address into the system. The customer is then asked to verify the recipient address on a digital screen at the counter. Thus, the customer is responsible to verify the address is correct which reduces the chances of mail being delivered to the wrong location. Once verified, the customer pays the postage, and the USPS generates a printed label that is affixed to the package. The printed label contains a barcode which

10

shows the package delivery location within USPS databases, regardless of what is written on the exterior of the package.

19.    In this instance, both packages had the address of 925 Gillette Street handwritten as the intended delivery address.  However, the USPS labels affixed to both packages displayed the intended delivery location was 425 Gossett Street.  Therefore, both packages were delivered to 425 Gossett Street, the delivery address of which would have been confirmed by the mailer.

20.    On May 30, 2023, the Honorable United States Magistrate Judge L. Patrick Auld, issued search warrants for both packages.  Upon execution of the search warrants, both packages were found to contain approximately ten pounds of methamphetamine within each.

## SURVEILLANCE OF IDENTIFIED USPS PACKAGES

21.    On September 5, 2023, the USPIS reviewed USPS business records pertaining to this investigation and identified two Priority Mail packages in transit to 5238 Hilltop Road Unit M, Jamestown, North Carolina, which were both mailed from Tolleson, Arizona, and scheduled to be delivered on September 7, 2023.

22.    The investigative team is aware the address at 5238 Hilltop Road Unit M, Jamestown, North Carolina, has been utilized by this Drug Trafficking Organization previously as a delivery address for suspected drug packages and

11

the team has conducted surveillance operations of those packages. During those surveillance operations, the investigative team has observed Nicholas CURRY, and other co-conspirators, retrieve some of these packages from 5238 Jamestown Road Unit M, Jamestown, North Carolina, and transport the packages to suspected "stash house" locations. Each of these packages that have been mailed to the Middle District of North Carolina have been shipped from the greater Phoenix, Arizona, area.

23.     On September 7, 2023, the investigative team conducted surveillance on the delivery of both packages. Investigators observed the delivery of both packages to 5238 Hilltop Road, Unit M, Jamestown, North Carolina. While conducting physical surveillance, investigators conducted electronic surveillance by monitoring the location of the **Target Cell Phone** via GPS pings[3] to aid in the surveillance operation. After the package was delivered, investigators observed the **Target Cell Phone** moving in the direction of 5238 Hilltop Road Unit M, Jamestown, North Carolina, from Greensboro, North Carolina.

---

[3] On August 15, 2023, the Honorable United States Magistrate Judge L. Patrick Auld issued a Search Warrant (1:23 MJ 354) ordering Verizon Wireless to disclose GPS location information on this Verizon Wireless number used by Nicholas Curry.

12

24. Approximately 15 minutes after the delivery, investigators observed CURRY arrive at 5238 Hilltop Road Unit M, Jamestown, North Carolina, exit his vehicle, approach the apartment complex, and retrieve both packages from the front of Apartment M. CURRY returned to his vehicle, placed both packages inside the trunk and departed the apartment complex.

25. As CURRY departed the apartment complex, investigators conducted mobile surveillance of the vehicle he was operating. While conducting surveillance, investigators observed CURRY conduct numerous maneuvers known to investigators to be counter-surveillance techniques. Some of these techniques included driving 10-15 miles per hour under the posted speed limit, driving into multiple parking lots and not exiting his vehicle, and was routinely observed looking into his rear-view mirrors in what investigators believed to be an attempt to identify surveillance units.

26. Due to the investigator's belief CURRY was conducting counter-surveillance techniques, the investigative team determined to no longer conduct mobile surveillance on CURRY's vehicle and decided to conduct electronic surveillance my monitoring the GPS location of **Target Cell Phone.** Approximately three hours later, while monitoring the location of the **Target Cell Phone**, investigators located CURRY and the vehicle he was observed

13

operating earlier in the day, at 5328 West Market Street, Building 12, Greensboro, North Carolina.

## TELEPHONE TOLL ANALYSIS OF TARGET CELL PHONE

27.     On June 2, 2023, the Honorable United States Magistrate Judge Joe L. Webster issued a Court Order authorizing a pen register and trap and trace on the **Target Cell Phone**, used by Nicholas CURRY and again on July 27, 2023, the Honorable United States Magistrate Judge Joi E. Peake issued a Court Order authorizing a pen register and trap and trace on the same telephone. An analysis of telephone toll and pen register records for the **Target Cell Phone** between May 5, 2023, and September 23, 2023 revealed the following incoming and outgoing calls to/from subscribers of particular interest:

| SUBSCRIBER OR USER | TELEPHONE NUMBER | FREQUENCY | DATE RANGE |
|---|---|---|---|
| ANTHONY LLOYD | 336-906-2715 | 244 | 6/2/2023 – 8/14/2023 |
| TRENT STARNES | 336-963-5762 | 181 | 6/3/2023 – 8/3/2023 |

28.     The following is an analysis of the subscribers and/or users of particular interest for CURRY's telephone number:

14

a.) The calls between CURRY and Anthony LLOYD are significant because LLOYD is known by the investigative team to be a large-scale distributor who also receives drug-laden parcels from CURRY. Between February and September of 2023, the investigative team has observed LLOYD and CURRY retrieve multiple suspected drug-laden parcels from 5238 Hilltop Road Unit M, Jamestown, North Carolina, and transport them to a suspected "stash house" location in Greensboro. Based on this information, the investigation yields that LLOYD and CURRY discuss their drug distribution activities over the **Target Cell Phone**.

b.) The calls between CURRY and Trent STARNES are significant because STARNES is also known by the investigative team to be a large-scale distributor, who receives narcotics from CURRY and re-distributes them throughout the Middle District of North Carolina. The investigative team purchased pound quantities of crystal methamphetamine from STARNES in July of 2023, and is aware STARNES and CURRY were previously identified in the same investigation in Arizona in which both were responsible for shipping marijuana parcels from Arizona throughout the United States, including North Carolina. Based on this information, the investigation yields that STARNES and CURRY discuss their drug distribution activities over the **Target Cell Phone**.

15

29. In conclusion, I believe that based on the information outlined above, CURRY is the user and possessor of the **Target Cell Phone** and probable cause exists that CURRY is a member of this MLDTO. I believe based on training and experience that obtaining the GPS location of the **Target Cell Phone** will allow law enforcement to identify locations used by the MLDTO to store drugs and drug proceeds, as well as identify currently unknown co-conspirators, drug customers, and drug sources of supply within the Middle District of North Carolina and throughout the United States.

## MANNER OF EXECUTION

30. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

31. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the

16

cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

32. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

17

## AUTHORIZATION REQUEST

33.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

34.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

18

35.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

Respectfully submitted,


/s/ Jordan Wicks
Jordan Wicks
U.S. Postal Inspector
U.S. Postal Inspection Service


In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this __19__ day of October, 2023, at __4:37__ a.m./p.m.


The Honorable Joi E. Peake
United States Magistrate Judge
Middle District Of North Carolina

19

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number (520) 540-7289, whose wireless provider is Verizon, a wireless telephone service provider headquartered at One Verizon Way, Basking Ridge, New Jersey, and whose listed subscriber is unknown.

## ATTACHMENT B

Pursuant to an investigation of Nicholas Curry, the suspected user of the target telephone for a violation of Title 21, United States Code §§ 841(a) and 846, this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of forty-five days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. See 18 U.S.C. § 3103a(b)(2).

2

The following restrictions apply:

1. Officers must make reasonable efforts to minimize the capture of signals emitted from cellular telephones other than the device identified in Attachment A.

2. Officers must immediately destroy all data other than data for the cellular devices identified in Attachment A. Destruction must occur within 48 hours after the data is captured, and verification of such must be included in the warrant return.

3. Officers are prohibited from using any data required beyond that necessary to determine the location of the cellular devices identified in Attachment A.